LEON E. LEWIS, SR. ET UX. *v.*
CHANDUS T. RIPPONS

[No. 124, September Term, 1977.]

*Decided March 13, 1978.*

The cause was argued before SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Richard M. Matthews* for appellants.

*Ronald A. Silkworth,* with whom were *Leroy W. Preston* and *O'Connor, Preston & Glenn, P.A.* and *Frederick C. Malkus* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here affirm the determination of a trial judge (Edmondson, J.) in the Circuit Court for Dorchester County relative to a land dispute.

Appellee, Chandus T. Rippons (Rippons), invoked the provisions of Maryland Code (1974) § 14-108, Real Property Article, and brought a bill of complaint against appellants, Leon E. Lewis, Sr., et ux. (Lewis), to quiet title. The chancellor decreed that Rippons "has absolute ownership of all that property described in a deed to [him] from James Ira Johnson, Sheriff, dated May 3, 1973 and recorded among the Land Records of Dorchester County, Maryland, in Liber P.L.C. No. 179, folio 354, and that he has the complete right of disposition thereof . . . ." We granted certiorari prior to consideration by the Court of Special Appeals of Lewis' appeal.

The facts will be better understood by reference to the plat which we append and direct the reporter to reproduce. The parties agree that this plat accurately portrays the land situation at the site.

Rippons bought Tract 2 as shown on the attached plat at a Dorchester County sheriff's sale. Lewis' predecessor in title purchased what was called Tract 3 at the same sale. That parcel included within its description all of Tract 2. The deed for Tract 3 was recorded first, thus generating this dispute.

In April 1941, the former owners of the property here involved acquired what appears as Tract 2 on the plat, a lot described as having a frontage of 200 feet on "the Old Steamboat Wharf Road, leading from the Old Steamboat Wharf to the Samuel M. Simmons Store Property" at

Hoopersville on Middle Hooper's Island in Dorchester County. The same parties later purchased from the same grantor an additional 115 feet south of what was known "as the 'Sail Loft' property," in December 1943. It will be noted that the designation "Sail Loft" appears on the plat on the parcel immediately north of Tract 3. A son of one of the grantees in the first deed said this additional land was procured because a warehouse was needed for the adjoining canning house located on Tract 2. The description used in this second deed called for a frontage of 315 feet on the county road. It thus embraced within its metes and bounds all of the land described in the original conveyance plus the additional 115 feet. Just why the deed was drawn in this manner we do not know, but this same son speculated at the trial below that the grantees desired that all their adjoining land be described in one deed. This statement has a familiar ring to those who have drawn conveyances for some unsophisticated buyers or sellers in this State and have found such people under the impression that "a deed" is maintained for their land at the courthouse of their county in such manner that it is necessary to have a new deed drawn as one adds to or subtracts from his adjoining landholdings so that the new deed will reflect the total land then owned and its proper description.[1] In 1954 the partners to whom the 1941 and 1943 conveyances had been made transferred these two lots and other land to a corporation. Tract 2 in that deed was described as it appears on the attached plat, and referred to the original 1941 conveyance to the partnership. Tract 3 referred to the 1943 conveyance and described it as it was set forth in that deed. However, the 1954 document first referred to the 1943 deed and then said:

"wherein the lands herein sought to be granted and conveyed as Tract No. 3 of this deed are more

---

1. Many of these same unsophisticated people seem to be under the impression that the record relative to their property among the land records is such that one may instantly pull and examine the deed to their land and tell whether their title is clear. It is probable that some title searchers involved in a complicated chain of title may at some time have wished that such matters were that simple.

particularly described as follows, (including within
the lines of said description all of the above described
Tract No. 2 of this deed),"

before going on to describe the land. Receivers for the
corporate grantee of the 1954 deed conveyed the land in 1957
to yet another corporation. It purported to grant Tracts 2, 3,
4, and 5 from the 1954 deed, referring to the tracts, as is the
usual Dorchester County practice, by the numbers of the
prior deed. Tract 2 was again described as it appears on the
attached plat, and as it was described in the 1941 instrument.
Tract 3 was similarly described in the language of the 1943
conveyance, except for the addition of the reference used in
1954 to the fact that Tract 3 included within its metes and
bounds the land described as Tract 2.

The grantee of the 1957 deed became indebted to the State
of Maryland. In due season a writ of fieri facias was directed
to the Sheriff of Dorchester County for the purpose of
satisfying that indebtedness. He seized and sold what appears
as Tracts 2, 3, 4, and 5 on the attached plat. The description
used in the advertisement of sale was that used in the 1957
deed, including as to Tract 3 the statement that there was
included "within the lines of said description all of the
[previously] described Tract No. 2 . . . ." Sale was held at the
Dorchester County Courthouse on March 13, 1968. Rippons
and Lewis were present. Rippons purchased Tract No. 2. Mr.
Lewis bid on Tracts 2 and 3. Tract 2 sold for $5,000. Lewis'
immediate predecessor in title purchased Tract 3 for $1,350.
Rippons explained this difference in the selling price between
the two parcels by pointing out that Tract 2 had a deep well
and a septic system which could be used. It also had a
bulkhead in front of it. As he put it, "You could erect a new
building there without too much trouble." He added that this
was his "purpose in buying it." Tract 3 had none of these
advantages. Rippons claimed that immediately after his
purchase at the sale he was approached by Mr. Lewis, who
owned adjoining property. Lewis asked if he were obliged to
move poles which he had placed upon Tract 2 and was
informed in the negative. The purchase price in each instance
was paid to the Sheriff on the day of sale. On April 3, 1968,

the Sheriff of Dorchester County conveyed Tract 3 to its purchaser by the same metes and bounds description which had been used from the time of the 1943 conveyance, but without explicit reference to the fact that it included within its lines all of Tract 2. Lewis acquired Tract 3 in 1972 from Oliver Harding and wife, the purchasers at the sheriff's sale. The same metes and bounds description was used, again without the reference to the fact that Tract 2 was embraced within Tract 3. Rippons did not obtain a deed from the Sheriff until May 1973. He explained this delay as having been caused by his desire to have Tract 2 and Tract 4 included in the same deed and his difficulty in identifying the location of a former steamboat wharf on Tract 4. Lewis is now claiming all of Tract 2.

There is a dispute as to the order in which the land was sold. Lewis and his witnesses testified that the sale was made in inverse order, beginning with Tract 5 and ending with Tract 2. Rippons and his witnesses, including the original purchaser of Tract 3, said that Tract 2 was sold first, followed by Tract 3, etc. The Sheriff of Dorchester County testified to this order of sale, referring to his notes which he said were made at the time and which substantiated the order of sale. The chancellor said relative to this:

> "[T]he Court finds that from the evidence that it's heard that the property was sold as it was advertised. We have had an abundance of testimony; we had the Sheriff's notes taken at the time of the sale, and I never saw a sale yet sold in reverse order. And if there is any question as to how it was sold, everyone is relying on memory except the Sheriff. His notes show that the property was sold in numerical order, two, three, four and five."

Harding and the Sheriff testified that they visited Hooper's Island after the sale, at which time the Sheriff pointed to the area which is labeled on the plat as Tract 3, having a frontage of 115 feet on the road, as the land actually sold to Harding. The Sheriff said the purchaser "had some knowledge of what he was going to buy," and that he showed Tract 3 to Harding

as "being between the canning house and what is called the Sail Loft property of Mr. Leon Lewis." He further said that Harding "walked it off." The Sheriff thought Harding "came up with something like 115 or 120 feet" as the road frontage. Tract 2 had had a canning house on it which at some time prior to the sale had been partially destroyed by fire. Harding said specifically that "[t]o [his] knowledge [he] didn't buy any part thereof."

On cross-examination it was pointed out to Mr. Lewis that Tract No. 3 sold for $1,350 and Tract No. 2, which he was then claiming as having been included within Tract No. 3, sold at $5,000. He was then asked why he did not bid higher on Tract 3, which was purchased by Harding, not Mr. Lewis. He replied:

> "I had gone as far that time as I wanted in any of it, and I knew there was something wrong with the deed to start with. You couldn't sell the property twice. In fact, I told the Sheriff he couldn't sell it twice, but it was sold twice."

Lewis also adduced testimony from another individual to the effect that the witness protested to the Sheriff the fact that Tract 2 was being sold twice.

The chancellor held that "what Mr. Lewis owns is 115 feet on the road and about 250 feet to the river . . . and what Mr. Rippons owns is the canning house property, running north up the road 200 feet and east to the river approximately 250 feet, which is the land described as tract number two in the advertisement of sale."

Under Maryland Rule 886 "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." There obviously was ample testimony here, if believed, to support the conclusion of the trial judge that Tract 2 was sold prior to Tract 3. It thus follows that the chancellor's determination as to the order of sale was not clearly erroneous. Accordingly, we shall proceed in our consideration of the case upon the premise that Tract 2 was sold first.

Lewis' sole contention to us is that since the deed from the Sheriff for Tract 3 was recorded first, it "conveys land therein described and defeats title to the same land as described in a subsequent deed."

The present statute relative to priority of first recorded deeds is Code (1974) § 3-203, Real Property Article. It became effective July 1, 1974. But for stylistic changes, it is the same as its predecessor, Code (1957, 1973 Repl. Vol.) Art. 21, § 3-203, which took effect on January 1, 1973. The latter statute is virtually the same as Code (1957) Art. 21, § 13, which was unchanged from the time of its enactment as Code (1860), Art. 24, § 16, based upon Chapter 203 of the Acts of 1825. Long ago in *Tyler v. Abergh,* 65 Md. 18, 20, 3 A. 904 (1886), our predecessors held this statute to refer to "deeds as between *bona fide* purchasers." *Accord, Grayson v. Buffington,* 233 Md. 340, 343, 196 A. 2d 893 (1964); and *Busey v. Reese,* 38 Md. 264, 270 (1873). In *Grayson* Judge Prescott said for the Court:

> "[I]t is well settled that one who purchases real property, with actual knowledge of prior equities, is not protected as a bona fide purchaser, but such a purchaser takes the property subject to the known equities, which are enforceable against him to the same extent that they are enforceable against the vendor. *Westpark, Inc. v. Seaton Land Co.,* 225 Md. 433, 450, 171 A. 2d 736 [(1961)]; *Blondell v. Turover,* 195 Md. 251, 257, 72 A. 2d 697 [(1950)]; *Lissau v. Smith,* 215 Md. 538, 547, 138 A. 2d 381 [(1958)]. The reason for the rule is so universally known and recognized that it seems superfluous to state it. However, IV *American Law of Property,* § 17.11, states it succinctly and well; so, even at the risk of being tedious, we repeat the same: '* * * [C]ourts and legislatures early took the view that if the object [of the recording statutes] was to protect purchasers from secret and unknown conveyances, these parties did not need a statute to protect them from one of which they had knowledge or notice. Except, therefore, under the few acts of the pure-race type,

a purchaser with notice cannot invoke protection.' At this point, it may be noted that Section 16, *supra,* specifically provides that a deed recorded after the time prescribed by Section 10 shall be valid 'against all purchasers with notice of such deed.' This is another clear manifestation that the Legislature, in enacting the recording acts, did not intend to protect subsequent purchasers with actual knowledge of a prior conveyance of the property purchased." *Id.* at 343-44.

Where a grantee accepts conveyance of property with actual knowledge that there has been a prior sale of part of that property, he is not a bona fide purchaser, notwithstanding the fact that the prior deed was not recorded. *Fertitta v. Bay Shore Dev. Corp.,* 252 Md. 393, 400, 250 A. 2d 69 (1969); and *Grayson,* 233 Md. at 343. Even constructive notice of prior unrecorded equities will preclude the grantee from being a bona fide purchaser, as we recently said in *Fertitta v. Bay Shore Dev. Corp.,* 266 Md. 59, 291 A. 2d 662 (1972):

"A purchaser cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him. If he neglects to make such inquiry, he will be guilty of bad faith and must suffer from his neglect. That which is sufficient to excite inquiry is notice of such facts as would lead an ordinarily prudent man to make an examination." *Id.* at 73.

Under the circumstances we have recited, Lewis was not a bona fide purchaser. Hence, the recording statute avails him not. However, there is a more fundamental reason why the decree here must be affirmed. As we shall hereafter develop, that reason is that title to these tracts passed to the purchasers upon the sale of them by the Sheriff. Accordingly, the subsequent deeds had no effect upon that title other than to confirm it. Therefore, which deed was executed and recorded first is irrelevant to the decision in this case.[2]

2. We take cognizance of Code (1974), § 14-103 (a) Real Property Article, which has no bearing on this case.

Title may vest in an individual by operation of law. A splendid example of this is the situation which prevailed prior to the revision of our law relative to decedent's estates in 1969. Now under Code (1974) § 1-301, Estates and Trusts Article, all property of a decedent, including real estate, passes "directly to the personal representative . . . ." An identical provision was enacted by Chapter 3 of the Acts of 1969 and is found in Code (1957, 1969 Repl. Vol.) Art. 93, § 1-301. Prior to that time real estate of an individual dying intestate vested by operation of law in the decedent's heirs-at-law with no conveyance of any kind being necessary.

In *Boring's Lessee v. Lemmon,* 5 H. & J. 223 (1821), Boring's property had been seized under a writ of fieri facias and sold to Lemmon at a sheriff's sale. Chief Judge Chase there said for our predecessors:

> "The Court are also of opinion, that the legal estate in Boring's Habitation Rock being vested in Ezekiel Boring at the time the *fieri facias* was levied on said land, the same was transferred by the sale of the sheriff to the vendee, Thomas Lemmon, by operation of law.
>
> "The Court are also of opinion, that a deed from the sheriff to the vendee, although frequently taken out of abundant caution as an additional evidence of the vendee's title, is not necessary to vest the legal estate in him." *Id.* at 226.

The rationale for this holding was explained by Chief Judge Buchanan in *Barney v. Patterson,* 6 H. & J. 182 (1824):

> "[I]t is not the return of the officer that gives title to a purchaser, but the previous sale; which was decided by this Court in the case of *Boring's Lessee vs. Lemmon,* 5 *H. & J.* 223. And it would be of dangerous consequence to *bona fide* purchasers, if after having paid their money for property sold under competent and legal authority, they should be at the mercy of officers who might make imperfect returns of executions, or if they pleased make no

returns at all. But a sheriff's sale of land being within the Statute of Frauds, some memorandum in writing is necessary to be made. It is therefore always right and proper, for the security and protection of purchasers, that in addition to a deed for the land sold, there should be a special return of the execution, particularly describing the premises, and setting out the name of the purchaser, either of which, though not operating to pass the title, would be safe and competent evidence of the sale." *Id.* at 204-05.

This latter passage was quoted by Judge Grason for the Court and relied upon in *Preissman v. Crockett,* 194 Md. 51, 61, 69 A. 2d 797 (1949). Holdings and statements similar to those in *Boring* and *Barney* are found in *Dorsey v. Dorsey,* 28 Md. 388, 393, 395 (1868); *Stump v. Henry,* 6 Md. 201, 209 (1854); *Estep v. Weems,* 6 G. & J. 303, 306-07 (1834); and 2 J. Poe, *Pleading and Practice* § 678 at 631 (5th ed. Tiffany 1925).

In *Remington v. Linthicum,* 39 U. S. (14 Pet.) 84, 10 L. Ed. 364 (1840), the Court was "governed by the laws of Maryland, as far as [it] c[ould] gather them from the decisions of her courts; because the property in question [was] situated in Washington County, in [the District of Columbia], where the laws of Maryland, as they existed at the time jurisdiction was assumed by Congress, ha[d] been adopted." In that case, Offutt in 1835 conveyed property to Remington, apparently to avoid his creditors. Linthicum sued Offutt in 1836 and recovered judgment. Executions on the judgment were issued, and in 1838 the marshal seized and sold the land which had belonged to Offutt. The purchaser at the marshal's sale, Linthicum, brought an action in ejectment against Remington, the person to whom Offutt had conveyed the land. No return had been made by the marshal prior to the institution of the ejectment action. To prove his title, Linthicum offered in evidence the writs of fieri facias "together with the indorsements upon them, and also a schedule, in the usual form, of the property seized; and a particular account of its sale, as entered in a book kept by the

clerk of the marshal for such purposes," all of which the Court said "had remained in the possession of the marshal...." Chief Justice Taney, a Maryland lawyer, in rendering the opinion of the Court, referred to *Boring's Lessee,* 5 H. & J. 225, and *Barney,* 6 H. & J. 204, which we have just quoted. He then said for the Court:

"The chief objection to the special return made by the marshal in this case, is, that it was not made before the suit was brought; and is not therefore admissible to show title at the commencement of the suit. This objection rests upon the hypothesis that a deed from the marshal, or a special return upon the execution, was necessary to perfect the title of the vendee. But the Court of Appeals of Maryland, in the two cases above referred to, have decided that neither the return nor the deed pass the title; that they are nothing more than evidence of the sale; and that it is the sale which transfers the title, by operation of law. It would seem to follow from these decisions, that it cannot be material at what time this evidence is obtained. He cannot recover without it, because the sale being within the statute of frauds, it must be proved by written evidence. But whenever this evidence is obtained, it proves the previous sale by the officer: and as it is the sale that passes the title, the vendee must take it from the day of the sale. The evidence may be procured, therefore, before or after suit brought; or before or after the jury are sworn in the trial of the ejectment. And the special return of the marshal, in the case before us, made at the time of the trial, was admissible in evidence; for when thus made, it related back to the sale, and proved the title to be good from that day. The return is also sufficiently special, and complies with the statute of frauds." *Id.* at 92, 10 L. Ed. at 368-69.

We find no statute, decision of this Court, or any Maryland rule contrary to the position taken by our predecessors more than 150 years ago, and quoted and relied upon by this Court

as recently as 1949. Therefore, given the finding of the chancellor that Tract 2 was sold first, it follows that upon its sale title vested in Rippons, and that the land described as Tract 2 could not have been sold by the Sheriff at the same sale as a part of Tract 3. Accordingly, the chancellor properly held Rippons to be vested with title to Tract 2.

> *Decree affirmed; appellants to pay the costs.*